**Mariah PUSUSTA, Respondent,**

v.

**STATE FARM INSURANCE COMPANIES, Petitioner, Appellant.**

No. C8–99–1068.

Supreme Court of Minnesota.

July 19, 2001.

Robert W. Roe, Thomas J. Lyons & Associates, P.A., St. Paul, for respondent.

William M. Hart, Katherine A. McBride, Jenneane L. Jansen, Meagher & Geer, P.L.L.P., Minneapolis, for appellant.

## OPINION

ANDERSON, RUSSELL A., Justice.

In mandatory arbitration, respondent Mariah Pususta sought no-fault medical expense benefits from her insurance carrier, appellant State Farm Insurance Companies (State Farm), for injuries she sustained in an automobile accident on December 6, 1997. We are asked to review the no-fault arbitrator's legal conclusion, upheld by the district court and affirmed by the court of appeals, that the arbitrator is precluded from considering whether some of the claimed medical expenses were for injuries that resulted from a prior nonautomobile accident, and if so, whether reimbursement for such expenses should be denied. We reverse and remand.

Pususta was in an automobile accident on December 6, 1997. At that time, she was receiving chiropractic care for back and neck injuries she sustained five years earlier in a horse-riding accident. In 1994,

her chiropractor requested that her health insurance carrier allow 24 chiropractic visits per year to treat the injuries sustained in the horse-riding accident. In 1997, Pususta visited the chiropractor once a month until the automobile accident in December. Following the accident, Pususta's pain worsened and her chiropractor concluded that the auto accident had exacerbated her prior injuries. After the accident, Pususta received more frequent chiropractic care: seven times in December 1997, nine times in January, eight times in February, nine times in March, seven times in April, twice in May, once in June, twice in July, and twice in August.

Pususta had a no-fault automobile insurance policy with State Farm. Following the accident, State Farm reimbursed Pususta for the medical care she received for her injuries through February 1998, but State Farm refused to provide further coverage until Pususta submitted to an independent medical exam (IME). Pususta attended an IME on July 16, 1998. The independent medical examiner concluded that some of Pususta's injuries were caused by the earlier horse-riding accident and that chiropractic care for injuries arising out of the auto accident was warranted only through the first week in April 1998. State Farm informed Pususta that on this basis it would provide coverage only for expenses incurred through the first week of April.

Pususta sought arbitration of the dispute and coverage for all chiropractic care through September 16, 1998, the date of the arbitration. State Farm argued it should not be required to pay for medical expenses incurred after the first week in April because the remaining medical expenses were due to the horse-riding injury and further treatment for any injuries related to the automobile accident was not reasonable or necessary. State Farm also argued that if it were required to pay for any medical care received after the first week in April, the expenses should be apportioned based on the degree to which the automobile accident caused the injuries. Specifically, State Farm asked that it not be required to pay for the 24 chiropractic visits per year that the chiropractor requested for the injuries that existed before the auto accident.

The arbitrator awarded Pususta all of her medical expenses through August 1998. In his written conclusions, the arbitrator stated that the facts of the case "would call for apportionment, based upon the prior accident," but that our decision in *Great West Casualty Co. v. Northland Ins. Co.*, 548 N.W.2d 279 (Minn.1996), precluded him from doing so. State Farm appealed. The district court upheld the award, and the court of appeals affirmed, concluding that under *Great West*, it was not clear that that the arbitrator erred by refusing to apportion medical expenses. *See Pususta v. State Farm Ins. Cos.*, No. C8–99–1068, 1999 WL 1101388 (Minn.App.1999). We granted review to consider the no-fault arbitrator's conclusion that he was precluded by our decision in *Great West* from considering whether a portion of the claimed medical expenses resulted from injuries caused by the horse-riding accident and whether reimbursement for such expenses should be denied.

No-fault arbitrators are limited to deciding questions of fact and their legal determinations are subject to de novo review by the courts. *Weaver v. State Farm Ins. Cos.*, 609 N.W.2d 878, 882 (Minn.2000). The issue before us is a legal determination, which we review de novo. *Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co.*, 615 N.W.2d 341, 344 (Minn.2000).

We begin our analysis of the issue by examining the provisions of the Minnesota No–Fault Automobile Insur-

ance Act [1] (No–Fault Act) relating to reimbursement of medical expenses. Our primary objective in interpreting statutory language is to give effect to the legislature's intent as expressed in the language of the statute. Minn.Stat. § 645.16 (2000). The No–Fault Act provides that an injured person, such as Pususta, is entitled to medical expense reimbursement "for all loss suffered through injury *arising out of* the maintenance or use of a motor vehicle * * *." Minn.Stat. § 65B.44, subd. 1 (2000) (emphasis added). The term "loss" is defined as economic detriment, which includes medical expenses "*resulting from* the accident causing the injury." Minn. Stat. § 65B.43, subd. 7 (2000) (emphasis added). The statutory language thus incorporates the element of causation into the determination of what losses are reimbursable.

▪ The question that the trier of fact, in this case the arbitrator, must determine under the No–Fault Act is whether the medical expenses Pususta claims result from injuries arising out of, or caused by, the use or maintenance of a motor vehicle; that is, whether the medical expenses claimed are for injuries caused by the automobile accident. We have set forth three general considerations for determining whether an injury arose out of the use of a motor vehicle. *See Cont'l W. Ins. Co. v. Klug*, 415 N.W.2d 876, 878 (Minn.1987).

In the case of this car accident, we are concerned only with the first consideration, which is the extent of causation between the automobile and the injury. *Id.*[2] The causal connection is established if "the injury is a natural and reasonable incident or consequence of the use of the vehicle." *N. River Ins. Co. v. Dairyland Ins. Co.*, 346 N.W.2d 109, 114 (Minn.1984) (quoting *Tlougan v. Auto–Owners Ins. Co.*, 310 N.W.2d 116, 117 (Minn.1981)).

As applied to this case, the arbitrator appeared to question whether all of the medical expenses Pususta claimed resulted from injuries caused by the car accident, but he declined to answer the question, referring to such a determination as an "apportionment" of expenses caused by the horse-riding accident and expenses caused by the auto accident. The arbitrator determined that the facts of this case called for such an apportionment, but he interpreted our decision in *Great West* to prohibit the apportionment of damages where two separate accidents contributed to an injury. *See* 548 N.W.2d at 281.[3]

In *Great West*, the insured injured his shoulder in 1988 in an accident that arose out of the use of a motor vehicle while he was working. *Id.* at 279. At the time he was insured by and received no-fault benefits from Northland Insurance Company. *Id.* In June 1991, the insured re-injured his shoulder, again arising out of use of a

---

1. Minn.Stat. §§ 65B.41–.71 (2000).

2. The other two factors are whether an act of independent significance broke the causal link between the vehicle use and the injuries, and what type of use of the auto was involved. *Klug*, 415 N.W.2d at 878.

3. The dissent acknowledges that there was conflicting medical testimony regarding the nature of Pususta's injuries. Our practice in no-fault arbitration cases is to defer to the factfinder's resolution of such conflicts. *See Johnson v. Am. Family Mut. Ins. Co.*, 426

N.W.2d 419, 422 (Minn.1988). Here the arbitrator found, "The particular facts of this current arbitration would call for apportionment, based upon the prior accident, the prior and very recent chiropractic care * * *." While we do not agree with the arbitrator's use of the term 'apportionment,' (*see infra* note 4) the implicit factual determination that some of Pususta's medical expenses were attributable to the earlier horse-riding accident is a factual determination within the arbitrator's factfinding powers. *Johnson*, 426 N.W.2d at 422.

motor vehicle. *Id.* At that time, Great West was his insurance carrier and it promptly provided coverage for his economic losses related to the injury. *Id.* at 279–80. By May 1992, Great West had paid more than $15,000 in no-fault benefits for the shoulder injury. *Id.* at 280.

Great West brought a subrogation and contribution action against Northland under Minn.Stat. § 65B.47 (2000), which establishes the priority for coverages available when the loss results from use of a vehicle for employment. For example, the statute provides that if a person is insured in a vehicle provided by his employer, basic economic loss benefits are to be provided by the insurance carrier covering the vehicle, or, if none, the carrier covering the injured person. Minn.Stat. § 65B.47, subd. 1 (2000). The statute provides that where two or more obligations to pay benefits are applicable, the reparation obligor against whom a claim is asserted must pay the claim as if wholly responsible, but that obligor may bring an action for contribution against other obligors. *Id.,* subd. 5. The statute also allows for an action in subrogation. *Id.,* subd. 6.

Great West claimed that the injury for which it paid benefits was partially caused by the June 1988 accident when the claimant was insured by Northland and sought reimbursement under Minn.Stat. § 65B.47 from Northland for a portion of the benefits Great West paid its insured. *Great West,* 548 N.W.2d at 280. We were asked whether under section 65B.47, a no-fault carrier may by subrogation or contribution obtain reimbursement from another no-fault carrier for paid benefits that it contends were for injuries resulting from an earlier car accident, when the claimant was insured by the other carrier. We noted that subrogation in the no-fault context is purely a creature of statute and that the

definition of "loss" under Minn.Stat. § 65B.43, subd. 7, implies that, for purposes of subrogation and contribution under section 65B.47, only one accident can be deemed the cause of an injury. *Great West,* 548 N.W.2d at 280–81. We concluded that the authorization for actions for subrogation and contribution in Minn.Stat. § 65B.47 does not apply to a multiple accident situation. *Great West,* 548 N.W.2d at 281.

*Great West* is distinguishable from the case at bar because *Great West* involved subrogation and contribution claims under section 65B.47, which establishes priorities between insurers for a single accident. *See Scheibel v. Ill. Farmers Ins. Co.,* 615 N.W.2d 34, 37 (Minn.2000) ("[O]ur holding in *Great West* only addressed whether an insurer has a right of subrogation under the no-fault act."). Here we deal with a more elementary and basic concern: whether the trier of fact, in this instance the arbitrator, may consider whether the medical expenses for which reimbursement is sought are for injuries caused by an earlier nonautomobile accident, in this instance a fall from a horse.

Pususta nonetheless relies on language in *Great West* indicating that attribution of medical expenses to prior accidents or injuries is improper in the no-fault context. In explaining the imposition of the entire expense on Great West, we stated:

> Great West accepted [the claimant] as an insured with whatever physical condition he may have had at that time, and *it is not for Great West to either refuse payment of benefits for that portion of his disability caused by a previous injury* or is it to seek subrogation from Northland therefore.

548 N.W.2d at 281 (emphasis added).[4] The implication of this ruling in *Great*

---

**4.** We further stated that through this ruling

"we cast a long shadow over the court of

*West* arose in *Scheibel,* where the claimant was injured in a March 1996 collision for which the insurer paid $3,558 in medical expenses. Less than two months later the claimant again injured his back in an auto accident requiring medical care. The insurer, the same for both accidents, attributed all medical expenses to coverage for the second accident, exhausting the $20,000 limit and leaving the claimant with approximately $6,500 in unpaid medical expenses. *Scheibel,* 615 N.W.2d at 36 n. 1.

In *Scheibel* we noted that our statement in *Great West* regarding attributing benefits to a previous injury was "not a part of our holding." *Scheibel,* 615 N.W.2d at 38. We nonetheless relied on this language to require the insurer in *Scheibel* to pay the maximum policy limit for injuries "regardless of the extent to which each accident contributed to the injuries." 615 N.W.2d at 39. Thus, the question presented is whether our decisions in *Great West* and

*Scheibel,* to the extent they reject attributing medical expenses to previous accidents, apply where the previous accident is not an automobile accident.[5]

■ We stated in *Scheibel:*

[The insurer] does not dispute that if Scheibel had been in two accidents and suffered distinct and separable injuries, medical expenses from each injury would have been separately compensable up to the policy maximum of $20,000 for each accident. We see no reason why the same principles should not apply when the second accident exacerbates an injury sustained in an earlier accident. It would be an absurd result to cut off recovery for an injury from the first accident merely because an intervening accident aggravates the same injury.

615 N.W.2d at 38–39.[6] Applying the same rationale used in *Scheibel* to these facts,

appeals' decision in *Rodgers v. Progressive Specialty Ins. Co.,* 499 N.W.2d 61 (Minn.App. 1993) [, *rev. denied* (Minn. Jun. 22, 1993) ]." In *Rodgers,* the claimant was still receiving medical care from an April 1990 auto accident when she was injured in a second, February 1991 accident. Her treating physician attributed 50 percent of Rodgers' injuries to the 1990 accident. The arbitrator awarded Rodgers the full amount of her medical expenses, but the district court reduced the award by half, stating that, "the insurer should pay only for those expenses that relate to the accident at hand." 499 N.W.2d at 62. The court of appeals affirmed, relying on use of the singular "the accident" causing injury in the definition of "loss" to exclude losses resulting from prior accidents. *Id.* at 63.

**5.** Thus, the dissent is correct that we have rejected subrogation claims under the No–Fault Act in the past. The dissent claims that the decision in this case is based on "equitable apportionment, which is an approach that we have specifically rejected for subrogation claims * * *." As noted herein, however, neither *Great West* nor *Scheibel* addressed the situation presented here, where the previous accident is not an automobile

accident. The dissent's charge that we apply equitable apportionment also is not accurate, as "apportionment" in the automobile insurance context refers to a situation where several automobile insurance policies arguably cover the loss. *See generally* 16 Couch on Insurance 2d § 62:32 (1983). Here, there is just one automobile insurance policy that covers the loss, and the question presented is a threshold question of whether the claimed medical expenses are losses "resulting from the accident causing the injury," as the legislature required before imposing liability on the insurer. Minn.Stat. § 65B.43, subd. 7. Contrary to the conclusion reached by the dissent, we do not tread on the legislative domain by curtailing recovery of injured persons; rather, we give effect to the clear statutory language that medical expense reimbursement be "for all loss suffered through injury arising out of the maintenance or use of a motor vehicle * * *." Minn.Stat. § 65B.44, subd. 1.

**6.** In *Scheibel* we chose not to apply the undisputed attribution of 35 percent of Scheibel's medical expenses to the first accident/policy and 65 percent of Scheibel's medical ex-

there can be no dispute that if Pususta had injured her foot in the horse-riding accident and injured her shoulder in the auto accident, medical expenses for the foot injury would not be attributable to the no-fault auto carrier. To hold the insurer liable for medical expenses resulting from a nonautomobile accident conflicts with the statutory language limiting the definition of loss to injuries "arising out of the maintenance or use of a motor vehicle * * *." Minn.Stat. § 65B.44, subd. 1.[7]

Both *Scheibel* and *Great West* must be read in the context in which they arose—a dispute over which no-fault policy the losses should be attributed to, where some of the losses arguably resulted from a prior auto accident. *Great West* stands for the proposition that where the legislature has not provided for contribution or subrogation between insurers in this context, we will not read such a right into the statute. 548 N.W.2d at 281. *Scheibel* stands for the proposition that an insurer cannot minimize its exposure by attributing all losses to one policy, and that within the no-fault context, the overriding principle is that an injured party be fully compensated to the

limits of mandated insurance. 615 N.W.2d at 38–39.

Neither *Great West* nor *Scheibel* prohibits an arbitrator from determining whether the medical expenses for which the insured is seeking reimbursement from the no-fault carrier result from injuries that arise out of the car accident, that is, the use or maintenance of a motor vehicle. In contrast to *Great West* and *Scheibel,* here we apparently have some medical expenses arising within the no-fault system and some arising outside that system. Within the no-fault system, i.e., where there are multiple auto accidents involved, imposing liability solely on the insurer at the time of the most recent accident to the extent such coverage fully compensates the claimant serves the legislative goals of ensuring prompt payment of expenses and minimizing litigation. Minn.Stat. § 65B.42 (2000); *Scheibel,* 615 N.W.2d at 37. Where, as here, one cause of injury arises within the no-fault system and one outside that system, our focus is on whether the loss arose out of the use of an automobile and whether reimbursement is for only those medical expenses resulting from injuries caused by the use or maintenance of an automobile.

penses to the second accident/policy. However, we did limit Scheibel's recovery under the first policy to only that unreimbursed portion of his total medical expenses attributable to the first accident, acknowledging that to do so relied to some extent on apportionment. 615 N.W.2d at 39 & n. 3. Likewise, attribution of expenses is appropriate here to give effect to the statutory language that losses arise out of the use of an automobile. Minn.Stat. § 65B.44, subd. 1. While we have acknowledged that attributing expenses to a particular injury is appropriate in these contexts, the factual posture of this case does not require us to reach the question whether the "long shadow" over *Rodgers* remains. *See Great West,* 548 N.W.2d at 281 n. 4.

7. The dissent relies on subdivision 2 of Minn. Stat. § 65B.44, which describes medical expense benefits available under the no-fault

system as "all reasonable expenses for necessary" services. The dissent ignores the context in which subdivision 2 arises, specifically that "medical expense loss" is described in subdivision 1 as a type of loss "suffered through injury *arising out of the maintenance or use of a motor vehicle* * * *." Minn.Stat. § 65B.44, subd. 1 (emphasis added). The dissent's construction of the statute provides a limitless standard that would allow recovery under the no-fault system for injuries wholly unrelated to use of a motor vehicle, contrary to the intent of the legislature.

The dissent also complains that the example of a foot injury and a shoulder injury is not helpful because it does not involve aggravation of a pre-existing injury. However, as we explain, aggravation of a pre-existing injury through an auto accident is unquestionably compensable through the no-fault system.

Pususta relies on the above-quoted language in *Great West* in arguing that State Farm must pay for all of her medical expenses because the insurer must take the insured with whatever condition she had at the time of the accident. *See Great West*, 548 N.W.2d at 281. However, there is no indication in the No–Fault Act that the legislature intended to modify the well-settled concept from tort law that damages are those attributable to a particular injury and the aggravation of a pre-existing physical condition. *See Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 275 n. 2 (Minn.1995) (stating compensatory damages are the "natural, necessary and usual result of the * * * occurrence in question."); *Leubner v. Sterner*, 493 N.W.2d 119, 122 (Minn.1992) (stating aggravation damages ensure that defendant pays only for the harm he causes, not the harm plaintiff already had); *Nelson v. Twin City Motor Bus Co.*, 239 Minn. 276, 280, 58 N.W.2d 561, 563 (1953). Requiring compensation for any aggravation of a pre-existing condition is what is meant by accepting the insured with any conditions she had at the time.[8] Accepting the insured with the conditions she had does not mean that the insurer is liable for the expenses that the pre-existing condition, "running its normal course, would itself have caused if there had been no aggravation * * *." *Nelson*, 239 Minn. at 280, 58 N.W.2d at 563. The insurer is liable for the expenses related to injuries caused or aggravated by the automobile accident. Limiting damages in this way insures that the insurer will pay only for the damages caused by the accident and not for the pre-existing physical condition. *Leubner*, 493 N.W.2d at 122. Applied to a no-fault case, the limitation ensures that a no-fault insurer pays only medical expenses for injuries arising out of the use of an automobile and not medical expenses for injuries caused by a nonautomobile accident.[9]

Thus, we reverse and remand and instruct the arbitrator to award those reasonable medical expenses for treatment of injuries caused by, or aggravated by, the automobile accident. The arbitrator must determine the extent to which the medical expense relates to an injury that was a natural and reasonable incident or consequence of the use of the vehicle. *North River*, 346 N.W.2d at 114. Medical expenses for injuries caused solely by the horse-riding accident shall be denied.

Reversed and remanded.

8. The dissent states that this case involves not "two different injuries but rather the aggravation of a pre-existing injury resulting from an auto accident," based on the IME report of David C. Olson, D.C. Whether Pususta's medical expenses are the result of the pre-existing injury or an aggravation of that injury is a fact question for the arbitrator to address on remand and not for an appellate court to determine in the first instance. To the extent the dissent assesses Olson's credibility, we note that Olson concludes that Pususta reached a pre-injury level of health in March 1998, indicating that any aggravation had ceased at that point.

9. The dissent claims that the result of our holding will be "more expenses, delays and disputes" over no-fault benefits. We recognize that the goals of the no-fault system include speeding the administration of justice and expediting resolution of disputes through arbitration. Minn.Stat. § 65B.42. Requiring no-fault insurers to unquestioningly pay for all medical care for pre-existing injuries after an auto accident also would minimize expense, delay and dispute, but would not give effect to the express intent of the legislature that no-fault losses arise from the maintenance or use of an automobile. *See* Minn. Stat. § 645.16 ("When words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit.").

GILBERT, Justice (dissenting).

I respectfully dissent from the majority opinion and would affirm the court of appeals. The majority opinion is based on equitable apportionment, which is an approach that we have specifically rejected for subrogation claims to determine medical expense benefits provided for in the Minnesota No–Fault Automobile Insurance Act (No–Fault Act). *Great West Cas. Co. v. Northland Ins. Co.,* 548 N.W.2d 279 (Minn.1996). The no-fault system was designed to eliminate this type of dispute on minor claims once a compensable loss occurs, and we have so held in other contexts. In fact, recently we stated "we disagree with the court's apportioning of PIP benefits, and we consider them payable by the insurer when the insured incurs a loss." *Id.* at 281 n. 4. The majority decision now reverses this directive and ignores the facts supporting the arbitrator's and trial court's ultimate decisions, awarding benefits in this case.

Here, the district court confirmed the medical expenses awarded in arbitration. It found that notwithstanding some comments made by the arbitrator relating to legal issues that "[a]ny allusion by the arbitrator to case law regarding apportionment was secondary to the facts which he had already decided. While defendant asserts that [the arbitrator] exceeded his powers, it has failed to make a clear showing that that was, in fact, the case." The trial court reasoned "[t]he arbitrator clearly decided that Plaintiff had been injured in the auto accident of December 6, 1997, and that she received chiropractic care related to that accident." Two experts were called upon in the arbitration hearing to give their opinion on the reasonable and necessary medical treatment required because of this automobile accident. Valerie Hoffman, D.C., offered an opinion on behalf of Pususta that the rehabilitation services being performed were for neck and upper back, not her lower back that was being treated before the automobile accident. David Olson, D.C., on behalf of State Farm, rendered an opinion authorizing paying the bills for medical rehabilitation through the beginning of April 1998, but none after that because that is when Pususta reached preaccident status. Accordingly, there was conflicting medical testimony, one opinion requiring additional treatment and the other terminating the treatment.

The court of appeals affirmed the arbitrator's decision considering the guidance provided the supreme court in *Great West* and could not say that the arbitrator and the district court erred in refusing to apportion the respondent's medical expenses. *Pususta v. State Farm Ins. Cos.,* No. C8–99–1068, 1999 WL 1101388 (Minn.App. 1999). Now, without calling the relief on remand apportionment, the majority reverses both of the lower courts with an order that the arbitrator must determine the extent to which the medical expenses relate to the use of a motor vehicle and "medical expenses for injuries caused by the horse riding accident shall be denied." This directive obviously calls for apportionment between accidents, which the arbitrator also determined was appropriate, but he felt constrained by our precedent in *Great West.* However, adopting the principle of apportionment severely interferes with the statutory framework that is "to govern the effect of advance payments prior to final settlement of liability" once a compensable loss occurs. Minn.Stat. § 65B.42, subd. 5 (2000).

The facts in this case highlight the problems that would be created by the majority's opinion. Pususta was 18 years old at the time of the automobile accident, which occurred on December 6, 1997. Before

authorizing any medical payments for that accident, State Farm ordered an independent medical examination. State Farm then decided to pay medical bills incurred through February 1998, but then stopped any further payments. Five months went by with no further payments and no denial of benefits. In the meantime, medical expenses had been incurred by an 18–year-old woman totaling more than $4,000. An independent medical examination was completed July 16, 1998, and an opinion rendered on July 23, 1998, 7 months after the automobile accident. Then, retroactively, Dr. Olson decided no further medical bills should be paid beyond the beginning of April of 1998. Now, the majority opinion will compel an independent medical examination whenever there is a preexisting nonauto-related accident case with resulting expense, uncertainty and delays now being thrust into every decision on payment. In most cases, this will lead to retroactive approval or denial of medical expenses incurred to treat in a timely fashion injuries arising from an automobile accident. This result will occur even though it is undisputed that early and proper rehabilitation treatment usually tends to mitigate everybody's damages. This is not to say that medical reimbursement would continue forever because there are statutory dollar limits applied to every policy and an arbitrator still would have the ability to terminate payments for medical expenses when pre-accident condition status has been reached. The No–Fault Act provides for such a determination now and that is why apportionment principles should be rejected for the same reason we rejected those principles for subrogation claims.

In *Great West,* we reasoned that a subrogation right must be found, if at all in the No–Fault Act, in that we do not recognize a separate common law right of subrogation in the no-fault context. 548 N.W.2d at 281. This interpretation was reacknowledged in *Scheibel v. Ill. Farmers Ins. Co.,* 615 N.W.2d 34, 37 (Minn.2000), and the reasoning should be followed in this case.

In *Great West,* we disallowed a subrogation claim against Northland brought by Great West who insured an individual injured in an automobile accident 3 years after the first automobile accident. 548 N.W.2d at 281. The majority attempts to distinguish this case from *Great West* depending on whether some of the medical expenses arose within or outside the no-fault system. *Great West* involved a multiple auto accident and the aggravation of a preexisting condition that resulted in a dispute between different insurance companies involved at the time of the two accidents, one in June 1988 and the second in June 1991. 548 N.W.2d at 279–80. We held that "[t]he clear implication is that only *one* accident can be deemed to be the cause of an injury for purposes of subrogation under section 65B.47." *Id.* at 281. This "one accident" precedent from *Great West* is even more compelling in this case.

As stated by the legislature, the purpose of the No–Fault Act is to relieve the severe economic distress of uncompensated victims of automobile accidents without regard to whose fault caused the accident and to encourage appropriate medical and rehabilitation treatment by assuring prompt payment for the treatment. Minn. Stat. § 65B.42. It is undisputed that the respondent has suffered a compensable loss in an automobile accident, is an injured person, and is entitled to reasonable medical expense benefits and the assurance of prompt payment. Minnesota Statutes § 65B.44, subdivision 2, provides for the reimbursement of "all reasonable expenses for necessary * * * medical * * * and rehabilitative services * * *." It is also undisputed that the respondent has a preexisting chronic medical injury due to a horse-riding accident.

The majority opinion deviates from the stated purpose of the Act and holds that the statutory language defining loss incorporates the elements of causation into the determination of what medical expense benefits are reimbursable. The majority opinion relies on two of our cases on causation between the use of an automobile and an injury. In *Continental Western,* we found that there was the requisite degree of causation between injuries and the use of a car when a gun was fired out of a moving vehicle causing injury to another party. *Cont'l W. Ins. Co. v. Klug,* 415 N.W.2d 876, 878 (Minn.1987). *North River* involved an injury from a trailer attached to a motor vehicle. *N. River Ins. Co. v. Dairyland Ins. Co.,* 346 N.W.2d 109, 114 (Minn.1984). However, these cases are not helpful because they do not involve PIP benefits and, in this case, it is undisputed that the second injury arose out of the use of an automobile.

Although our decision in *Great West* involved a subrogation claim between insurers for an injury caused by more than one auto accident, the legal principles, which support the denial of a subrogation claim, apply equally as well to the facts in this case.

The majority's decision in this case has the same

> * * * potential to trigger precisely what the legislature appears to have attempted to avoid in adopting the term "the accident"-finger pointing among insurers claiming that another carrier was responsible for some portion of the insured's disability. Further, as we noted above, it introduces the fault-based concept of subrogation into allocation of loss independent of fault, a step we are unwilling to take without explicit statutory authority notably absent here. That the entire responsibility for Neulieb's disability caused by the accident occurring

> while Great West was on the policy should fall on Great West is neither unfair nor unjust. *Great West accepted Neulieb as an insured with whatever physical condition he may have had at the time, and it is not for Great West to either refuse payments of benefits for that portion of his disability caused by a previous injury or is it to seek subrogation from Northland therefore.*

*Great West,* 548 N.W.2d at 281 (emphasis added).

The majority opinion also charts new legal ground in determining no-fault medical expense benefits by using common law tort principles to modify the No–Fault Act. It supports its rationale by citing *Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d 271 (Minn.1995), which decided what general and special damages were in the context of an age and disability claim, *Leubner v. Sterner,* 493 N.W.2d 119 (Minn. 1992), which was a medical malpractice claim, and *Nelson v. Twin City Motor Bus Co.,* 239 Minn. 276, 58 N.W.2d 561 (1953). The majority then summarily distinguishes medical expenses from those caused by previous nonauto accidents from those caused by the more recent auto accident even though it is undisputed that the auto accident aggravated a chronic preexisting condition and the insured suffered a compensable loss. To shore up its reasoning, the majority opinion then gives an example of two separate injuries, one to one's foot caused by a horse-riding accident and another to one's shoulder caused by an auto accident. However, that example is not helpful because it obviously does not involve an aggravation of a preexisting injury, nor does it support a distinction between auto and nonauto-related accidents when the later injury was a compensable loss under the No–Fault Act.

In this case, the record indicates that we do not have two different injuries but rath-

er the aggravation of a preexisting injury resulting from an auto accident.[10] As in *Great West,* the entire responsibility for the insured's disability caused by the accident occurred while State Farm was on the policy. State Farm accepted Pususta as an insured with whatever physical condition she may have had at the time and it is not for State Farm now to either refuse payments of benefits for that portion of disability caused by the previous injury or to seek subrogation. *See Great West,* 548 N.W.2d at 281. Importantly, once a compensable loss occurs, the No–Fault Act does not contain equitable apportionment of medical expense benefits nor have we previously recognized a common-law right to seek apportionment of medical expenses based on a preexisting condition in the no-fault context.

If we disallow subrogation of medical expense benefits between two insurance companies based on the one-accident principle, (that is, the last accident for purposes of the No–Fault Act), that is all the more reason to apply that same legal principle to prohibit insurers from attempting to offset, allocate or seek apportionment of medical expense benefits from their insureds. The No–Fault Act was not designed to pit an insurer against its insured for these basic medical benefits but rather to encourage swift, inexpensive rights to claim the benefits, without regard to fault or apportionment. Minn.Stat. § 658.42. The majority opinion will require more expert testimony of all the parties whenever a preexisting condition exists. This will only lead to more expenses, delays and disputes over these basic benefits. The No–Fault Act was designed to remove these subjective disputes to insure PIP coverage in exchange for removing the injured's right or necessity to have to sue

for those types of benefits prior to no-fault coverage. *See* Minn.Stat. § 65B.51, subds. 1, 3 (2000).

In that the legislature did not provide for apportionment, it is not for this court to make up an additional distinction for entitlement to PIP benefits, based on injuries "within the no-fault system and some medical expenses arising outside that system." The No–Fault Act has already provided a standard to determine medical expense benefits: " * * * all reasonable expenses for necessary * * * medical, * * * and rehabilitative services * * *." Minn.Stat. § 65B.44, subd. 2. We should continue to abide by this standard and our "one accident" precedent rather than create judicial modifications of the No–Fault Act. The legislature is the policy-making branch better suited to make these fine distinctions. I would therefore affirm.

---

**10.** In his independent chiropractic evaluation of July 16, 1998, Dr. Olson described the most recent accident as "exacerbating chronic pre-

existent symptoms * * * [and an] aggravation to pre-existent conditions." Appellant's Appendix at 25–26.